## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **IN THE MATTER OF THE** | ) | |
| **SEARCH OF:** | ) | **Misc. No. _____** |
| | ) | |
| **An Apple iPhone,** | ) | |
| **IMEI:013428006537268** | ) | |
| | ) | |
| **An Apple Macbook Pro, Model A1286** | ) | |
| **Serial Number: W89153CM8Q1** | ) | |
| | ) | |
| **An Apple iPad tablet, Model A1395** | ) | |
| **Serial Number: DLXFQ0K7DKPK** | ) | |

## AFFIDAVIT

I, Jeffrey Meixner, Special Agent, Bureau of Alcohol, Tobacco, Firearms and Explosives

(ATF), currently assigned to the National Investigative Division (hereinafter the "affiant") being

duly sworn states as follows:

### INTRODUCTION

1.  I am a Special Agent with ATF, who is empowered by law to investigate and to make

arrests for offenses enumerated by Section 3051 of Title 18, United States Code.

2.  Your affiant is currently assigned to the National Investigative Division, in Washington,

D.C. I have been previously assigned to the ATF Washington Field Division, Group I High

Intensity Drug Trafficking Area (HIDTA) Task Force. I have been a Federal Law Enforcement

Officer with the United States Government for more than 21 years and have worked for ATF for

approximately 16 years. During my tenure as a Federal Law Enforcement Officer in Washington,

D.C., and the surrounding metropolitan area, I have taken part in over 300 federal and local

criminal investigations, to include the investigations of armed gangs, firearms traffickers, narcotics

traffickers, contraband cigarette traffickers, armed robbery, retaliatory shootings, murder, fraud,

arson, and various types of thefts. I have attended a number of schools and training venues hosted

by ATF, HIDTA, and the Federal Law Enforcement Training Center (FLETC) dealing in various techniques of investigating various criminal acts. I am a graduate of the FLETC Police Training Program, Criminal Investigator Training Program and the ATF National Academy.

3.  Based on my training and experience, I am aware that:

a.      Those who commit crimes involving firearms, ammunition, and explosives, including but not limited to possession, importation, and manufacturing-related offenses, often use computers, cellular telephones, and other electronic devices to facilitate the planning and execution of their criminal activities, including, among other things, communications between conspirators, internet searches and site visits, and documentation related to such offenses.

b.      Those who commit crimes involving firearms, ammunition, and explosives often use cellular telephones, computers, and other electronic devices to take, or cause to be taken, and/or store, photographs of themselves, their associates, weapons, ammunition, explosives, and related devices, and property derived from illegal activities.

c.      Those who commit crimes involving firearms, ammunition, and explosives sometimes keep address and/or telephone books, reflecting names, addresses, e-mails telephone numbers, pager numbers, fax numbers and/or telex numbers, including computerized or electronic address and telephone records, of their associates; and these address or telephone books can often be found on their cellular telephones, computers, or other electronic devices.

d.      Those who commit crimes involving firearms, ammunition, and explosives sometimes keep within their cellular telephones, computers, or other electronic media storage devices calendars, diaries, or other documents used to record schedules, meetings, conversations, or other events related to their criminal activities;

e.    Electronic devices can store information for long periods of time and even when a user deletes information from a device, it can sometimes be recovered using forensics tools.

4.  This affidavit is based, in part, upon information provided to me by other agents of the ATF, and other law enforcement agents.  Based on your affiant's participation in this investigation, as well as through interviews with and analysis of reports submitted by other law enforcement agents and officers who are involved in this investigation, I am familiar with all aspects of this investigation.  I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to obtain a search warrant for the cellular telephone, computers, and electronic media storage devices referenced herein.

## THE INVESTIGATION

5.  In or about January 2013, ATF Washington (HIDTA) was notified by the ATF New Orleans Field Division, that their investigation of Raimo HUOLMAN, a Swedish National, revealed that HUOLMAN conspired with others in the U.S. to illegally import, transfer and possess unregistered National Firearms Act (NFA) weapons. HUOLMAN was indicted (Sealed) in or about April 2012, in the Western District of Louisiana for Conspiracy to Smuggle Goods into the United States (Title 18 USC Section 371). On or about May 22, 2013, a superseding indictment was filed charging HUOLMAN with (9) nine counts of Unlawful Transfer of Machineguns (Title 26 USC Section 5861(e) and (9) nine counts of Smuggling Goods into the United States (Title 18 USC Section 545).

6.  As part of his business in Sweden, HUOLMAN operated a website where he advertised and sold gun parts to customers. Specifically, HUOLMAN advertised silencer parts on his website as "potato tubes" and "Educational Neilsen dummy suppressors." Other weapons advertised, sold and smuggled by HUOLMAN included devices commonly known as "Lightning Links" which are used to convert semi-automatic AR-15 type rifles to function as machineguns; Glock "auto switches" which

3

are used to convert semi-automatic handguns to function as machineguns; silencers and silencer parts designed to fit a variety of weapons; MAC 11 "machine gun flats" which are used to manufacture a machinegun; full-auto conversion trigger packs, which are used to convert semi-automatic firearms to function as a machinegun; and M-16 machinegun receivers. HUOLMAN was previously engaged in illegally importing firearms parts into the U.S., which were determined to be machineguns and silencers (NFA weapons) under the NFA.

7. Email records and receipts, obtained pursuant to a Mutual Legal Assistance Instrument (MLAT) filed in the Western District of Louisiana in March of 2013, revealed that HUOLMAN sent a "potato tube and builders kit" and a "Educational Neilsen dummy suppressor" (i.e., silencer parts) to Morris JOHNSON, 3038 Chestnut Street, Northwest, Washington, D.C., on multiple occasions. On or between August 13, 2010 and April 16, 2012 Morris JOHNSON communicated via email with HUOLMAN regarding the purchase of silencers, auto sears, and other firearm parts. During this time period, JOHNSON ordered, paid for, and had silencers, machine guns, and firearm parts shipped to 3038 Chestnut Street, Northwest, Washington, D.C. ATF has recovered these similar items purchased by other customers in the United States from HUOLMAN. These items that were recovered were deemed to be National Firearms Act (NFA) weapons and were seized pursuant to a search warrant.

8. On December 26, 2013, your Affiant caused a query of the NFA Branch records and learned that Morris JOHNSON has no NFA weapons (silencers, machine guns) legally registered to him. The National Firearms Registration and Transfer Record is maintained by ATF and contains a record of all legally owned NFA weapons. It is a criminal offense to possess silencers and machineguns not registered. See paragraphs 19, 20, and 21 herein for a summary of the law.

9. On January 6, 2014, your Affiant caused a query of the Washington D.C., Metropolitan Police Department (MPD) Gun Registration Records. Neither Morris JOHNSON nor any person residing at

3038 Chestnut Street, N.W., Washington, D.C., possess any firearms or ammunition registered with the MPD Gun Registration Unit.

10. On January 16, 2014, Magistrate Judge Deborah A. Robinson, of the United States District Court for the District of Columbia, issued a Search and Seizure Warrant (Case Number 14-mj-0050) for 3038 Chestnut Street, NW, Washington, D.C., permitting law enforcement agents to search for, and seize, NFA weapons or parts, related notes and documents, and computers, among other items.[1]

11. On January 23, 2014, at approximately 8:20 p.m., ATF executed a search warrant at 3038 Chestnut Street, N.W., and recovered explosive materials and parts, including black powder, multiple improvised explosive devices, primers, fuses, and other components for constructing explosive devices, and an Apple iPhone (IMEI 013428006537268), an Apple Macbook Pro laptop computer Model A1286 (Serial No. W89153CM8Q1), and an Apple iPad tablet Model A1395 (Serial No. DLXFQ0K7DKPK) described in Attachment A (collectively, the "target devices"). The target devices, including a computer, tablet, and smartphone, appear to be capable of (i) accessing the internet, and therefore, (ii) sending and receiving electronic messages like those that law enforcement reviewed between HUOLMAN and Morris JOHNSON.

12. On January 16, 2018, a superseding indictment was returned by a Grand Jury sitting in the United States District Court for the District of Columbia, charging defendant Morris JOHNSON with the following offenses: (1) Unlawful Receipt or Possession of an Unregistered Firearm and Destructive Device; (2) Unlawful Making of a Firearm; (3) Conspiracy to Smuggle Goods into the United States; (4) Conspiracy to Engage in the Interstate Transportation of Unregistered Machineguns and Silencers; and (5) Possession of a Weapon of Mass Destruction. *See* Dkt. No. 70, D.D.C. Case No. 15-cr-125-KBJ.

---

[1] Your affiant hereby incorporates by reference herein the Affidavit in Support of the Search Warrant issued in Case Number 14-mj-0050 on January 16, 2014 and included as Attachment C.

## TECHNICAL TERMS

13. Based on my training and experience, and information acquired from other law enforcement officials with technical expertise, I know the terms described below have the following meanings or characteristics:

a. "Digital device," as used herein, includes the following three terms and their respective definitions:

1) A "computer" means an electronic, magnetic, optical, or other high speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device. *See* 18 U.S.C. § 1030(e)(1). Computers are physical units of equipment that perform information processing using a binary system to represent information. Computers include, but are not limited to, desktop and laptop computers, smartphones, tablets, smartwatches, and binary data processing units used in the operation of other products like automobiles.

2) "Digital storage media," as used herein, means any information storage device in which information is preserved in binary form and includes electrical, optical, and magnetic digital storage devices. Examples of digital storage media include, but are not limited to, compact disks, digital versatile disks ("DVDs"), USB flash drives, flash memory cards, and internal and external hard drives.

3) "Computer hardware" means all equipment that can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data. Computer hardware includes any data-processing devices (including, but not limited to, central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, floppy disk drives and diskettes, and other memory storage

6

devices); peripheral input/output devices (including, but not limited to, keyboards, printers, video display monitors, modems, routers, scanners and related communications devices such as cables and connections), as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including, but not limited to, physical keys and locks).

   b.   A "tablet" is a mobile computer, typically larger than a wireless phone yet smaller than a notebook, that is primarily operated by touch-screen. Like wireless phones, tablets function as wireless communication devices and can be used to access the Internet or other wired or wireless devices through cellular networks, "wi-fi" networks, or otherwise. Tablets typically contain programs called applications ("apps"), which, like programs on both wireless phones, as described above, and personal computers, perform many different functions and save data associated with those functions.

   c.   A "GPS" navigation device, including certain wireless phones and tablets, uses the Global Positioning System (generally abbreviated "GPS") to display its current location, and often retains records of its historical locations. Some GPS navigation devices can give a user driving or walking directions to another location, and may contain records of the addresses or locations involved in such historical navigation. The GPS consists of NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

      d.      "Computer passwords and data security devices" means information or items designed to restrict access to or hide computer software, documentation, or data. Data security devices may consist of hardware, software, or other programming code. A password (a string of alpha-numeric characters) usually operates as a digital key to "unlock" particular data security devices. Data security hardware may include encryption devices, chips, and circuit boards. Data security software of digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched. Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the progress to restore it.

      e.      "Computer software" means digital information which can be interpreted by a computer and any of its related components to direct the way they work. Computer software is stored in electronic, magnetic, or other digital form. It commonly includes programs to run operating systems, applications, and utilities.

      f.      Internet Protocol ("IP") Address is a unique numeric address used by digital devices on the Internet. An IP address, for present purposes, may appear as a series of four numbers, each in the range 0-255, separated by periods (*e.g.*, 149.101.1.32). Every computer attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

      g.      The Internet is a global network of computers and other electronic devices that communicate with each other using numerous specified protocols. Due to the structure of the

8

Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

   h.  "Internet Service Providers," or "ISPs," are entities that provide individuals and businesses access to the Internet. ISPs provide a range of functions for their customers, including access to the Internet, web hosting, e-mail, remote storage, and co-location of computers and other communications equipment. ISPs can offer a range of options in providing access to the Internet, including via telephone-based dial-up and broadband access via digital subscriber line ("DSL"), cable, dedicated circuits, fiber-optic, or satellite. ISPs typically charge a fee based upon the type of connection and volume of data, called bandwidth, which the connection supports. Many ISPs assign each subscriber an account name, a user name or screen name, an e-mail address, an e-mail mailbox, and a personal password selected by the subscriber. By using a modem, the subscriber can establish communication with an ISP and access the Internet by using his or her account name and password.

   i.  A "modem" translates signals for physical transmission to and from the ISP, which then sends and receives the information to and from other computers connected to the Internet.

   j.  A "router" often serves as a wireless Internet access point for a single or multiple devices, and directs traffic between computers connected to a network (whether by wire or wirelessly). A router connected to the Internet collects traffic bound for the Internet from its client machines and sends out requests on their behalf. The router also distributes to the relevant client inbound traffic arriving from the Internet. A router usually retains logs for any devices using that router for Internet connectivity. Routers, in turn, are typically connected to a modem.

k.      "Domain Name" means the common, easy-to-remember names associated with an IP address. For example, a domain name of "www.usdoj.gov" refers to the IP address of 149.101.1.32. Domain names are typically strings of alphanumeric characters, with each level delimited by a period. Each level, read backwards – from right to left – further identifies parts of an organization. Examples of first-level, or top-level domains are typically .com for commercial organizations, .gov for the governmental organizations, .org for organizations, and, .edu for educational organizations. Second-level names will further identify the organization, for example, usdoj.gov further identifies the United States governmental agency to be the Department of Justice. Additional levels may exist as needed until each machine is uniquely identifiable. For example, www.usdoj.gov identifies the World Wide Web server located at the United States Department of Justice, which is part of the United States government.

l.      "Cache" means the text, image, and graphic files sent to and temporarily stored by a user's computer from a website accessed by the user in order to allow the user speedier access to and interaction with that website.

m.      "Peer to Peer file sharing" (P2P) is a method of communication available to Internet users through the use of special software, which may be downloaded from the Internet. In general, P2P software allows a user to share files on a computer with other computer users running compatible P2P software. A user may obtain files by opening the P2P software on the user's computer and searching for files that are currently being shared on the network. A P2P file transfer is assisted by reference to the IP addresses of computers on the network: an IP address identifies the location of each P2P computer and makes it possible for data to be transferred between computers. One aspect of P2P file sharing is that multiple files may be downloaded at

the same time. Another aspect of P2P file sharing is that, when downloading a file, portions of that file may come from multiple other users on the network to facilitate faster downloading.

        i.      When a user wishes to share a file, the user adds the file to shared library files (either by downloading a file from another user or by copying any file into the shared directory), and the file's hash value is recorded by the P2P software. The hash value is independent of the file name; that is, any change in the name of the file will not change the hash value.

        ii.     Third party software is available to identify the IP address of a P2P computer that is sending a file. Such software monitors and logs Internet and local network traffic.

        n.    "VPN" means a virtual private network. A VPN extends a private network across public networks like the Internet. It enables a host computer to send and receive data across shared or public networks as if they were an integral part of a private network with all the functionality, security, and management policies of the private network. This is done by establishing a virtual point-to-point connection through the use of dedicated connections, encryption, or a combination of the two. The VPN connection across the Internet is technically a wide area network (WAN) link between the sites. From a user perspective, the extended network resources are accessed in the same way as resources available from a private network-hence the name "virtual private network." The communication between two VPN endpoints is encrypted and usually cannot be intercepted by law enforcement.

        o.      "Encryption" is the process of encoding messages or information in such a way that eavesdroppers or hackers cannot read it but authorized parties can. In an encryption scheme, the message or information, referred to as plaintext, is encrypted using an encryption algorithm, turning it into an unreadable ciphertext. This is usually done with the use of an encryption key, which specifies how the message is to be encoded. Any unintended party that can

see the ciphertext should not be able to determine anything about the original message. An authorized party, however, is able to decode the ciphertext using a decryption algorithm that usually requires a secret decryption key, to which adversaries do not have access.

14. In my training and experience, examining data stored on the target devices can uncover, among other things, evidence that reveals or suggests who possessed or used the device, and sometimes by implication who did not, as well as evidence relating to the commission of the offenses under investigation.

## COMPUTERS, ELECTRONIC/MAGNETIC STORAGE, AND FORENSIC ANALYSIS

15. As described above and in Attachment B, this application seeks permission to search for information that might be found within the target devices. Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I respectfully submit that there is probable cause to believe that the records and information described in Attachment B will be stored in the target devices for at least the following reasons:

       a.    Individuals who engage in criminal activity, including offenses involving firearms, ammunition, and explosives, use digital devices, like the target devices, to access websites to facilitate illegal activity and to communicate with co-conspirators online; to store on digital devices, like the target devices, documents and records relating to their illegal activity, which can include logs of online "chats" with co-conspirators; email correspondence; text or other "Short Message Service" ("SMS") messages; contact information of co-conspirators, including telephone numbers, email addresses, identifiers for instant messaging and social media accounts; and records of financial transactions related to the illegal conduct, including transfer and disposition of proceeds of illegal activity.

b.     Individuals who engage in the foregoing criminal activity, in the event that they change digital devices, will often "back up" or transfer files from their old digital devices to that of their new digital devices, so as not to lose data, including that described in the foregoing paragraph, which would be valuable in facilitating their criminal activity.

c.     Digital device files, or remnants of such files, can be recovered months or even many years after they have been downloaded onto the medium or device, deleted, or viewed via the Internet. Electronic files downloaded to a digital device can be stored for years at little or no cost. Even when such files have been deleted, they can be recovered months or years later using readily available forensics tools. When a person "deletes" a file on a digital device such as a home computer, a smart phone, or a memory card, the data contained in the file does not actually disappear; rather, that data remains on the storage medium and within the device unless and until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space – that is, in space on the digital device that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space – for long periods of time before they are overwritten. In addition, a digital device's operating system may also keep a record of deleted data in a "swap" or "recovery" file. Similarly, files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or "cache." The browser typically maintains a fixed amount of electronic storage medium space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages. Thus, the ability to retrieve "residue" of an electronic file from a digital device depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer, smart phone, or other digital device habits.

13

16. As further described in Attachment B, this application seeks permission to locate not only electronic evidence or information that might serve as direct evidence of the crimes described in this affidavit, but also for forensic electronic evidence or information that establishes how the digital device(s) were used, the purpose of their use, who used them (or did not), and when. Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I respectfully submit there is probable cause to believe that this forensic electronic evidence and information will be in any of the target devices at issue here because:

a. Although some of the records called for by this warrant might be found in the form of user-generated documents or records (such as word processing, picture, movie, or texting files), digital devices can contain other forms of electronic evidence as well. In particular, records of how a digital device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials contained on the digital device(s) are, as described further in the attachments, called for by this warrant. Those records will not always be found in digital data that is neatly segregable from the hard drive, flash drive, memory card, or other electronic storage media image as a whole. Digital data stored in the target devices, not currently associated with any file, can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave digital data on a hard drive that show what tasks and processes on a digital device were recently used. Web browsers, e-mail programs, and chat programs often store configuration data on a hard drive, flash drive, memory card, or memory chip that can reveal information such as online nicknames and passwords. Operating systems can record additional

data, such as the attachment of peripherals, the attachment of USB flash storage devices, and the times a computer, smart phone, or other digital device was in use. Computer, smart phone, and other digital device file systems can record data about the dates files were created and the sequence in which they were created. This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations. Recovery of this data requires specialized tools and a controlled laboratory environment, and also can require substantial time.

b. Forensic evidence on a digital device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, registry information, configuration files, user profiles, e-mail, e-mail address books, "chat," instant messaging logs, photographs, the presence or absence of malware, and correspondence (and the data associated with the foregoing, such as file creation and last-accessed dates) may be evidence of who used or controlled the digital device at a relevant time, and potentially who did not.

c. A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a digital device that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, digital device evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on digital devices is evidence may depend on other information stored on the devices and the application of knowledge about how the devices behave.

Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a digital device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on the device. For example, the presence or absence of counter-forensic programs, anti-virus programs (and associated data), and malware may be relevant to establishing the user's intent and the identity of the user.

## METHODS TO BE USED TO SEARCH DIGITAL DEVICES

17. Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I know that:

a. Searching digital devices can be an extremely technical process, often requiring specific expertise, specialized equipment, and substantial amounts of time, in part because there are so many types of digital devices and software programs in use today. Digital devices – whether, for example, desktop computers, mobile devices, or portable storage devices – may be customized with a vast array of software applications, each generating a particular form of information or records and each often requiring unique forensic tools, techniques, and expertise. As a result, it may be necessary to consult with specially trained personnel who have specific expertise in the types of digital devices, operating systems, or software applications that are being searched, and to obtain specialized hardware and software solutions to meet the needs of a particular forensic analysis.

b. Digital data is particularly vulnerable to inadvertent or intentional modification or destruction. Searching digital devices can require the use of precise, scientific procedures that are designed to maintain the integrity of digital data and to recover "hidden," erased, compressed,

16

encrypted, or password-protected data.  Recovery of "residue" of electronic files from digital devices also requires specialized tools and often substantial time.  As a result, a controlled environment, such as a law enforcement laboratory or similar facility, is often essential to conducting a complete and accurate analysis of data stored on digital devices.

c.  Further, as discussed above, evidence of how a digital device has been used, the purposes for which it has been used, and who has used it, may be reflected in the absence of particular data on a digital device.  For example, to rebut a claim that the owner of a digital device was not responsible for a particular use because the device was being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone else to control the digital device remotely is not present on the digital device.  Evidence of the absence of particular data or software on a digital device is not segregable from the digital device itself. Analysis of the digital device as a whole to demonstrate the absence of particular data or software requires specialized tools and a controlled laboratory environment, and can require substantial time.

d.  Digital device users can attempt to conceal data within digital devices through a number of methods, including the use of innocuous or misleading filenames and extensions.  For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear that the file contains text.  Digital device users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form. Digital device users may encode communications or files, including substituting innocuous terms for incriminating terms or deliberately misspelling words, thereby thwarting "keyword" search techniques and necessitating continuous modification of keyword terms.  Moreover, certain file

formats, like portable document format ("PDF"), do not lend themselves to keyword searches. Some applications for computers, smart phones, and other digital devices, do not store data as searchable text; rather, the data is saved in a proprietary non-text format. Documents printed by a computer, even if the document was never saved to the hard drive, are recoverable by forensic examiners but not discoverable by keyword searches because the printed document is stored by the computer as a graphic image and not as text. In addition, digital device users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography." For example, by using steganography a digital device user can conceal text in an image file that cannot be viewed when the image file is opened. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. A substantial amount of time is necessary to extract and sort through data that is concealed, encrypted, or subject to booby traps, to determine whether it is evidence, contraband or instrumentalities of a crime.

e. Analyzing the contents of mobile devices, including tablets, can be very labor intensive and also requires special technical skills, equipment, and software. The large, and ever increasing, number and variety of available mobile device applications generate unique forms of data, in different formats, and user information, all of which present formidable and sometimes novel forensic challenges to investigators that cannot be anticipated before examination of the device. Additionally, most smart phones and other mobile devices require passwords for access. For example, even older iPhone 4 models, running IOS 7, deployed a type of sophisticated encryption known as "AES-256 encryption" to secure and encrypt the operating system and application data, which could only be bypassed with a numeric passcode. Newer cell phones employ equally sophisticated encryption along with alpha-numeric passcodes, rendering most smart phones inaccessible without highly sophisticated forensic tools and techniques, or assistance

from the phone manufacturer. Mobile devices used by individuals engaged in criminal activity are often further protected and encrypted by one or more third party applications, of which there are many. For example, one such mobile application, "Hide It Pro," disguises itself as an audio application, allows users to hide pictures and documents, and offers the same sophisticated AES-256 encryption for all data stored within the database in the mobile device.

   f. Based on all of the foregoing, I respectfully submit that searching any digital device for the information, records, or evidence pursuant to this warrant may require a wide array of electronic data analysis techniques and may take weeks or months to complete. Any pre-defined search protocol would only inevitably result in over- or under-inclusive searches, and misdirected time and effort, as forensic examiners encounter technological and user-created challenges, content, and software applications that cannot be anticipated in advance of the forensic examination of the devices. In light of these difficulties, your affiant requests permission to use whatever data analysis techniques reasonably appear to be necessary to locate and retrieve digital information, records, or evidence within the scope of this warrant.

   g. In searching for information, records, or evidence, further described in Attachment B, law enforcement personnel executing this search warrant will employ the following procedures:

   1. The digital devices, and/or any digital images thereof created by law enforcement in aid of the examination and review, will be examined and reviewed by law enforcement personnel, sometimes with the aid of a technical expert, in an appropriate setting, in order to extract and seize the information, records, or evidence described in Attachment B.

   2. The analysis of the contents of the digital devices may entail any or all of various forensic techniques as circumstances warrant. Such techniques may include, but shall not be limited to, surveying various file "directories" and the individual files they contain

(analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files); conducting a file-by-file review by "opening," reviewing, or reading the images or first few "pages" of such files in order to determine their precise contents; "scanning" storage areas to discover and possibly recover recently deleted data; scanning storage areas for deliberately hidden files; and performing electronic "keyword" searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are related to the subject matter of the investigation. In searching the digital devices, the forensic examiners may examine as much of the contents of the devices as deemed necessary to make a determination as to whether the contents fall within the items to be seized as set forth in Attachment B. In addition, the forensic examiners may search for and attempt to recover "deleted," "hidden," or encrypted data to determine whether the contents fall within the items to be seized as described in Attachment B. Any search techniques or protocols used in searching the contents of the digital devices will be specifically chosen to identify the specific items to be seized under this warrant.

### AUTHORIZATION TO SEARCH AT ANY TIME OF THE DAY OR NIGHT

18. Because forensic examiners will be conducting their search of the digital devices in a law enforcement setting over a potentially prolonged period of time, I respectfully submit good cause has been shown, and therefore request authority, to conduct the search at any time of the day or night.

## **CONCLUSION**

19. Your affiant asserts that the facts set forth in this affidavit establish probable cause to believe that Morris JOHNSON, and others both known and unknown, have participated in offenses involving contraband listed under Title 18, United States Code, Section 922 (o)(1) that states "... it shall be unlawful for any person to transfer or possess a machinegun." The term "machinegun" is defined in Title 26, United States Code, Section 5845(b) as "any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger. The term shall also include the frame or receiver or any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person." Further, the terms "silencer" and "firearm muffler" are defined in Title 18, United States Code, Section 921(a)(24), and mean any device for silencing, muffling, or diminishing the report of a portable firearm, including any combination of parts, designed or redesigned, and intended for use in assembling or fabricating a firearm silencer or firearm muffler, and any part intended only for use in such assembly or fabrication.

20. Additionally, your Affiant is familiar with the Federal criminal law Title 26, United States Code, Sections 5861 (a), (c), (d), (f), and (j) which state "it shall be unlawful for any person (a) to engage in business as a manufacturer ... in firearms without having paid the special (occupational) tax required by section 5801 ... or having registered as required by section 5802; or ... (c) to receive or possess a firearm made in violation of the provisions of this chapter; or (d) to receive or possess a firearm which is not registered to him in the National Firearms Registration and Transfer Record; or ... (f) to make a firearm in violation of the provisions of this chapter; or ... (j) to transport, deliver, or receive any firearm in interstate commerce which has not been registered as required by this chapter."

Further, your Affiant is familiar with Title 22, D.C. Code, Section 3154(a), which forbids knowing possession of a weapon of mass destruction. Your Affiant asserts that the facts set forth in this affidavit establish probable cause to believe that Morris JOHNSON, and others both known and unknown, have participated in offenses involving violations of the above-referenced sections.

21. Additionally, your affiant asserts that the facts set forth in this affidavit establish probable cause to believe that Morris JOHNSON, and others both known and unknown, have conspired to, and participated in, importing and smuggling merchandise, contrary to the law, into the United States, in violation of Federal criminal law Title 26, United States Code, Section 5844 and Title 18, United States Code, Section 545.

22. Based on all of the foregoing information presented in this affidavit, your affiant submits that there is probable cause to believe that, stored within the electronic memory and files of the target devices, as set forth in **Attachment A**, are evidence, instrumentalities, and fruits of the above-referenced offenses, as set forth more fully in **Attachment B** and incorporated herein by references.

_____

Jeffrey Meixner, Special Agent
Bureau of Alcohol, Tobacco, Firearms and Explosives

Sworn and subscribed to before me this
_____ day of March, 2018.

_____

Robin M. Meriweather
United States Magistrate Judge
for the District of Columbia

22

## ATTACHMENT A

The property to be searched is a

      a.      **An Apple iPhone,**
                     **IMEI:013428006537268**

      b.      **An Apple Macbook Pro, Model A1286,**
                     **Serial Number: W89153CM8Q1**

      c.      **An Apple iPad tablet, Model A1395,**
                     **Serial Number: DLXFQ0K7DKPK**

These items are currently securely stored with law enforcement in the District of Columbia.

## ATTACHMENT B

1.      All records on the target devices described in Attachment A that relate to violations of 18 U.S.C. §§ 921, 922; 26 U.S.C. §§ 5845, 5861; and Title 22 D.C. Code, Section 3154, including:

     a.  all communications, including emails, text messages, video messages, or other forms of communications related to possession, importation, and manufacturing of firearms, ammunition, and explosives, including communications concerning such criminal offenses;

     b.  records of or information about the devices' Internet activity related to the above offenses, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

     c.  any information related to the identification of participants in offenses involving the above offenses (including names, addresses, e-mail addresses, phone numbers, or any other identifying information);

     d.  all bank records, checks, credit card bills, account information, wire transfers, cash withdrawals and deposit slips, and other financial records;

     e.  information stored on the Devices that may be necessary to access the Devices or to conduct a forensic examination of the Devices;

     f.  records of or information about Internet Protocol addresses used by the Devices; and

     g.  evidence of the times the Devices were used.

3.     Evidence of user attribution showing who used or owned the target devices at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

2

## ATTACHMENT C

Affidavit in Support of Search Warrant

Case Number 14-mj-0050

January 16, 2014

## IN THE UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF COLUMBIA

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF: | ) |
| | ) |
| **3038 CHESTNUT STREET NORTHWEST** | ) |
| **WASHINGTON, D.C.** | ) |

Case: 1:14-mj-0050
Assigned To : Magistrate Judge Deborah A. Robinson
Assign. Date : 01/16/2014
Description: Search and Seizure Warrant

## AFFIDAVIT

I, Jeffrey Meixner, Special Agent, Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), assigned to the Washington D.C. ATF HIDTA Task Force, (hereinafter the "affiant") being duly sworn states as follows:

### INTRODUCTION

1.     I am a Special Agent with ATF, assigned to the Washington Field Division who is empowered by law to investigate and to make arrests for offenses enumerated by Section 3051 of Title 18, United States Code.

2.     Your affiant in this matter is ATF S.A. Jeffrey Meixner. I am currently assigned to the Washington Group 1 High Intensity Drug Trafficking Area (HIDTA) Task Force. I have been a Federal Law Enforcement Officer with the United States Government for approximately 17 years and have worked for ATF for approximately 12 years. During my tenure as a Federal Law Enforcement Officer in Washington, D.C., and the surrounding metropolitan area, I have taken part in over 300 federal and local criminal investigations, to include the investigations of armed gangs, firearms traffickers, narcotics traffickers, contraband cigarette traffickers, armed robbery, retaliatory shootings, murder, fraud, arson, and various types of thefts. I have attended a number of schools and training venues hosted by ATF, HIDTA, and the Federal Law Enforcement Training Center (FLETC) dealing in various techniques of investigating various criminal acts. I am a graduate of the FLETC Police Training Program, Criminal Investigator Training Program and the ATF National Academy.

3. Based on my training and experience, I am aware that:

a. That firearms and/or silencers can be converted and/or manufactured utilizing commercially available tools and machinery. These tools and machines are also utilized for legal purposes such as cutting, grinding and shaping pieces of metal for various purposes. These tools can include various hand tools, belt or disk sanders, drill presses, dremel tools, files, milling machines and band saws.

b. Individuals can manufacture illegal firearms and also use the same tools and machines for lawful purposes. Since these tools and machines are used for many purposes, it has been your Affiant's experience that they are kept for extended periods of time, to include years, in a person's residence. These tools and machines also leave unique tool marks on the items they are used to make.

c. I have learned that suspects who commit crimes with firearms keep firearms and ammunition to protect themselves from law enforcement, rival gang members and other individuals who may pose a threat to the safety of these suspects. I have learned that suspects who possess firearms and ammunition in Washington, D.C., keep these items within their residences or the residences of others in order to protect them from theft and to protect their illegal criminal profits which are commonly stored within these residences. I have also learned that suspects who own or possess firearms and ammunition in Washington, D.C., also keep other firearm related equipment, to include ammunition magazines, holsters, bullet proof vests, pistol grips, boxes, cleaning kits and paperwork relating to the acquisition and disposition of firearms. I have learned that suspects keep firearms, ammunition and their accessories secreted within their residences and or vehicles for extended periods of time due to the fact that it is illegal without

registration, as well as difficult to obtain particular firearms and firearms related accessories, such as ammunition, within the District of Columbia. Lastly, I have learned and experienced that suspects do not carry their entire inventory of ammunition or equipment, such as ammunition and ammunition magazines, while carrying their firearms on their person or in a vehicle, but will keep their available ammunition and magazines in their residence for future use.

## THE INVESTIGATION

4.   In or about January 2013, ATF Washington (HIDTA) was notified by the ATF New Orleans Field Division, that their investigation of Ramio HUOLMAN, a Swedish National, revealed that HUOLMAN conspired with others in the U.S. to illegally import, transfer and possess unregistered National Firearms Act (NFA) weapons.  HUOLMAN was indicted (Sealed) in or about April 2012, in the Western District of Louisiana for Conspiracy to Smuggle Goods into the United States (Title 18 USC, Section 371).  On or about May 22, 2013, a superseding indictment was filed charging HUOLMAN with (9) nine counts of Unlawful Transfer of Machineguns (Title 26 USC Section 5861(e) and (9) nine counts of Smuggling Goods into the United States (Title 18 USC Section 545).

5.   As part of his business in Sweden, HUOLMAN operated a website where he advertised and sold gun parts to customers.  Specifically, HUOLMAN advertised silencer parts on his website as "potato tubes" and "Educational Neilsen dummy suppressors."  Other weapons advertised, sold and smuggled by HUOLMAN included devices commonly known as "Lightning Links" which are used to convert semi-automatic AR-15 type rifles to function as machineguns; Glock "auto switches" which are used to convert semi-automatic handguns to function as machineguns; silencers and silencer parts designed to fit a variety of weapons; MAC 11

"machine gun flats" which are used to manufacture a machinegun; full-auto conversion trigger packs which are used to convert semi-automatic firearms to function as a machinegun; and M-16 machinegun receivers. HUOLMAN is currently out on bond and in Sweden. HUOLMAN was, and continues to, illegally import firearms parts into the U.S. which were determined to be machineguns and silencers (NFA weapons) under the NFA.

6.  Email records and receipts, obtained pursuant to a Mutual Legal Assistance Instrument (MLAT) filed in the Western District of Louisiana in March of 2013, revealed that HUOLMAN sent a "potato tube and builders kit" and a "Educational Neilsen dummy suppressor" (i.e., silencer parts) to Morris JOHNSON, 3038 Chestnut Street, Northwest, Washington, D.C. on multiple occasions. On or between August 13, 2010 and April 16, 2012 Morris JOHNSON communicated via email with HUOLMAN regarding the purchase of silencers, auto sears, and other firearm parts. During this time period, JOHNSON ordered, paid for, and had silencers, machine guns, and firearm parts shipped to 3038 Chestnut Street, Northwest, Washington, D.C. ATF has recovered these similar items purchased by other customers in the United States that were purchased from HUOLMAN. These items that were recovered were deemed to be National Firearms Act (NFA) weapons and were seized pursuant to a search warrant. Similar cause as explained herein after exists to search 3038 Chestnut Street, N.W., Washington, D.C.

7.  On December 26, 2013, your Affiant caused the query of the NFA Branch records and learned that Morris JOHNSON has no NFA weapons (silencers, machine guns) legally registered to him. The National Firearms Registration and Transfer Record is maintained by ATF and contains a record of all legally owned NFA weapons. It is a criminal offense to possess

silencers and machineguns not registered. See paragraphs 13 and 14 herein for a summary of the law.

8.    On January 6, 2014, your Affiant caused the query of the Washington D.C. Metropolitan Police Department (MPD) Gun Registration Records. Morris JOHNSON and or any person residing at 3038 Chestnut Street N.W. Washington, D.C. do not have any firearms or ammunition registered with the MPD Gun Registration Unit.

9.    According to District of Columbia Motor Vehicles (DMV), Morris Gemal JOHNSON has a District of Columbia driver's license that was issued on or about October 27, 2011 and is valid through October 15, 2019. JOHNSON's driver's license lists the address of 3038 Chestnut Street, NW, Washington, D.C.

10. According to D.C. DMV, Morris Gemal JOHNSON currently has a 2006 Suzuki, RK6 Motorcycle with Vehicle Identification Number: JS1GR7KA862106688 registered to 3038 Chestnut Street, N.W. Washington, D.C. This motorcycle was originally titled to JOHNSON at the aforementioned address on or about March 13, 2009.

11. According to District of Columbia Voter Registration records, Morris G. JOHNSON has a current voter registration and identifies 3038 Chestnut Street, N.W. Washington, D.C. as the current address. According to voter records, JOHNSON voted on or about November 4, 2008 utilizing this same address. Consequently, these records show that Morris G. Johnson resided at the above address between August 2010 and April 2012 when email records show that he was ordering silencers and machineguns from HUOLMAN over the internet and that HUOLMAN was shipping same to the above address.

12.    On or about October 29, 2013 and December 31, 2013, surveillance was conducted at 3038 Chestnut Street, N.W., Washington, D.C.   A 2007 Lexus bearing D.C. registration EK6388 was observed parked at the residence.  According to D.C. DMV the Lexus is registered to Morris JOHNSON and is registered to 3038 Chestnut Street, N.W. Washington, D.C.  There is evidence that JOHNSON still resides at the above address.

## CONCLUSION

13.    Your affiant asserts that the facts set forth in this affidavit establish probable cause to believe that the residence that Morris JOHNSON was located in contains these evidentiary items of contraband for Title 18, United States Code, Section 922 (o)(1) that states "...it shall be unlawful for any person to transfer or possess a machinegun." The term "machinegun" is defined in Title 26, United States Code, Section 5845(b) as "any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger.  The term shall also include the frame or receiver or any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person." Further, the term "silencer" and "firearm muffler" is defined in Title 18, United States Code, Section 921(a)(24) mean any device for silencing, muffling, or diminishing the report of a portable firearm, including any combination of parts, designed or redesigned, and intended for use in assembling or fabricating a firearm silencer or firearm muffler, and any part intended only for use in such assembly or fabrication.

14.    Additionally, your Affiant is familiar with the Federal criminal law Title 26, United States Code, Sections 5861 (a), (c), (d), (f), and (j) which state "it shall be unlawful for any person (a) to engage in business as a manufacturer…in firearms without having paid the special (occupational) tax required by section 5801 …or having registered as required by section 5802; or . . . (c) to receive or possess a firearm made in violation of the provisions of this chapter; or (d) to receive or possess a firearm which is not registered to him in the National Firearms Registration and Transfer Record; or . . . (f) to make a firearm in violation of the provisions of this chapter; or . . . (j) to transport, deliver, or receive any firearm in interstate commerce which has not been registered as required by this chapter."

15.    Therefore, there is probable cause to believe that Morris JOHNSON is still illegally in possession of silencers and machineguns and that there is probable cause to believe that these illegal items, evidence, fruits and instrumentalities of the target offense(s), as set forth more fully in **Attachment B** and incorporated herein by reference, are located at the target premises as more fully described in **Attachment A** also incorporated herein by reference.

Jeffrey Meixner, Special Agent
Bureau of Alcohol, Tobacco, Firearms and Explosives

JAN 16 2014

Sworn and subscribed to before me this
_____ day of January, 2014.

DEBORAH A. ROBINSON
United States Magistrate Judge
for the District of Columbia

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

## ATTACHMENT A

### IN THE MATTER OF THE SEARCH OF:

**3038 CHESTNUT STREET, NORTHWEST, WASHINGTON, D.C.**

(1)   **Description of Premises**

This location is described as a single family residence with a cream colored façade, two front windows and a single car garage facing the front. The residence is on the south side of Chestnut Street Northwest, west of Oregon Avenue Northwest. The front door has a full glass pane storm door, with the handle located on the right. The numbers "3038" are above the front door and are in black.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

## ATTACHMENT B

### IN THE MATTER OF THE SEARCH OF:

### ITEMS TO BE SEIZED

The items of evidence to be searched are described herein as:

1.  Any and all tools or machinery used in the manufacturing of NFA weapons such as silencers, machineguns, or destructive devices.  Including, but not limited to, devices used to cut, shape or grind metal into precise dimensions such as hand tools, belt sanders, disk sanders, drill press, dremel tool, files, milling machine or band saws, as well as any molds, templates, blueprints or patterns for any items which are used to convert firearms to function as an NFA weapon.

2.  Any and all NFA weapons or parts of NFA weapons to include, but not limited to: completed machineguns and machinegun parts (templates, flats, receivers, back plates, selectors, disconnectors, lightning links ) completed silencers and silencer parts (spacers, end caps, rings, baffles, tubes), grenades, rockets, and explosive powders.

3.  Any and all information, notes, documents, records, or correspondence, in any format or medium relating to the sale, manufacture, possession, or transfer of NFA weapons to include, but not limited to, receipts, documents, owner's manuals and technical bulletins concerning conversion of firearms to fully automatic.

4.  Computers, hard drives, CD's and other storage devices.  If evidence located on a computer or other storage device appears to relate to criminal acts other than violations of Title 18, United States Code, Section 922(o) or Title 26, United States Code, Sections 5861 (a), (c), (d), (f), and (j), those items will not be further examined unless and until a search warrant is applied for and issued for evidence of any such separate criminal act.

5.  Any and all information, documents, records, or correspondence, in any format or medium pertaining to occupancy or ownership of the premises and use or ownership of tools, machinery, NFA weapons or parts, computers or storage media, as noted above.